### MAXWELL *v.* MAXWELL.

## Opinion delivered March 27, 1911.

DEEDS—DELIVERY.—There is no delivery of a deed unless what is said and done by the grantor and grantee manifests their intention that the deed shall at once become operative to pass the title to the land conveyed and that the grantor shall lose dominion over the deed. Thus where a grantor executed a deed to her son, and left it at her lawyer's office, telling the grantee that it was there and promising to place it where he could get it if anything happened to her, and he without her knowledge or consent procured it to be recorded, there was no delivery.

Appeal from Independence Chancery Court; *G. T. Humphries*, Chancellor; affirmed.

### STATEMENT BY THE COURT.

This action was instituted by appellee against appellant to cancel a deed to certain lots in Charleston's Addition to the town of Batesville. Appellant was the son of appellee. She set forth certain facts which she alleged constituted fraud, deceit, misrepresentation and undue influence on the part of appellant by

which she was induced to sign the deed. The appellee further alleged that the deed was never "in fact delivered" to appellant; "that she left it with the notary to be delivered to Chas. E. Maxwell, for him to bring home to her, but that he had the same recorded, * * * that defendant's action in getting possession of this deed and having it recorded casts a cloud on her title." She set forth the deed, which recited that for the consideration of $100 she conveyed to appellant and unto his heirs and assigns forever certain lots which are described. The deed contained the following clause:

"This sale is on condition that I shall have and retain possession and control, as well as the exclusive use and enjoyment of the said premises during the remainder of my natural lifetime, and at my death the same shall go to and become the property of the said Chas. E. Maxwell, his heirs or assigns, but not before; it being my intention and purpose to reserve to myself a life estate in said lands."

The appellant denied all the allegations of the complaint. The testimony of appellee, concerning the delivery of the deed is as follows:

That she went alone to the office of Chas. F. Cole, the notary before whom the deed in controversy was executed and acknowledged, on both occasions of her visit there. "The first time Mr. Cole read the deed over to me and asked me if I wanted to change it in any particular; I asked him to fix it so that the property would not go to his daughter. A few days after that I went back to Mr. Cole's office and stayed there an hour or two, and Mr. Cole read the deed over carefully to me, and I said I didn't know whether I ought to sign it or not, and he said for me not to sign it unless I wanted to. He said, 'Charley is a pretty good boy, and I think he will come up to his promises.' When I left the deed with Mr. Cole, I pushed it back on the table and said: 'There it is.' I don't remember telling Mr. Cole what to do with it. I remember telling him there it is; and if Mr. Cole had not said what he did to me, I certainly would not have signed it. I expected Mr. Cole to hand Charley the deed, and he would bring it back to me. I thought I could have destroyed it if I changed my mind. I am sure I would not have destroyed it if Charley had come up to his promises. The land was worth about $2,500."

The testimony of appellant in regard to the execution and delivery of the deed is as follows:

"I assisted in taking care of the family prior to my father's death; after my father's death about 14 years ago I assisted in taking care of my mother and the children; she promised me a number of times that she would give me the home place, which is the place now in controversy; she made two or three wills giving me the place, and afterwards destroyed all but one of them. I went to her one time, and asked her if she would give me a contract and allow me to pay her a money consideration for the place. She said that she did not know, but that she would talk the matter over and see. We talked the matter over a number of times. One day when I went home to dinner, she met me on the back porch and says: 'Charley, I have a great mind just to sell it to you—give you a deed to the place.' She says: 'If I give you a deed to the place, will you keep it strictly to yourself?' I told her I would if she would place the deed where I could get it if anything happened to her. She said she would place it in that little black tin box of hers, and I could get it there. About a week after that I went home one day, and she said: 'Well, I have signed the deed.' I asked her where it was, and she said she had left it at Mr. Cole's office. I asked her why she did not bring it home, and she said she did not know whether it would suit me or not, because she had made some changes in it. I went to Mr. Cole and got it, and had it recorded and delivered it to my mother. I did not practice any fraud or deceit on my mother, and did not make any misrepresentations to obtain the deed. I did not use any undue influence over her, or do anything except what I have just stated. I furnished my father in his life time with money at various times in amounts ranging from $5 to $25. I can safely say that before his death I let him have at least $500. I can safely say that since my father's death and during the last fourteen years I have furnished my mother (the plaintiff) $1,000. I have paid the taxes on the property mentioned in the deed for five or six years. My mother said the place belonged to me, and I ought to keep the taxes paid on it. I offered to pay this $100 note before it was due, and she said she did not want it. The money I furnished my mother was furnished with the understanding that the place would go to me

at her death. This was her understanding and her statement to me. She frequently discussed the matter with me, and stated that that would be the disposition of the property."

C. F. Cole testified as follows: "I prepared the deed and took the acknowledgment to the deed in controversy in this suit. Mrs. Maxwell came to my office the first time about a week before the deed was executed. She was alone, and stated to me that she wanted to prepare a deed for her and Charley, as they had come to an agreement about her home place, and asked me some questions about whether she could retain a life interest or not. I told her it could be so arranged, and after some conversation with her she left the office without making any deed. Several days after this she came to my office alone. In the meantime I had prepared a deed according to my understanding of the agreement between Mr. and Mrs. Maxwell, and also a note for $100, which Mr. Maxwell had signed and left with me. She came to my office the second time alone, and I read to her the deed I had prepared, explaining fully every part and provision. She was in the office perhaps a half hour or more this time. She stated something about whether she really ought to sign it or not, and I told her if she did not feel like doing so she ought not to sign it. She afterwards signed and acknowledged the deed and handed it to me with the instructions to deliver it to Mr. Maxwell, which I did. When she gave me the deed, I gave her the note for $100 which Mr. Maxwell had left with me. She then left the office, and that was the end of the matter."

The court found that the deed was without adequate consideration, and that it was executed by reason of false representations made to the plaintiff by the defendant, and by reason of undue influence of defendant over the plaintiff. The court further found "that the allegations of plaintiff's complaint have been established." The court rendered a decree cancelling the deed.

*Oldfield & Cole, McCaleb & Reeder,* for appellant.

1. There was no fraud nor deceit and equity never decrees cancellation of an extended contract except in a clear case upon convincing proof. 97 U. S. 207, 24 Law Ed. 112; 121 U. S. 380; 56 Ill. App. 545; 41 Minn. 37; 112 Ala. 576; 77 Ia. 188; 9 Pa.

Dist. 59; 6 *Id.* 36; 2 Pom. Eq. Jur. § 928, p. 1669; 22 Ark. 92; 27 *Id.* 166.

2. The evidence does not show misrepresentations, nor were the promises any part of the consideration for the deed. 2 Pom. Eq. Jur. § 876; *Id.* § 890-1; 241 Ill. 521; 24 L. R. A. (N. S.) 735-737.

3. There was no undue influence. 13 Cyc. 585-6; 13 Cyc. 588; 52 S. W. 98; 21 Tex. Civ. App. 512; 118 Pa. 259; 5 Har. (Del.) 459; 72 Conn. 305; 28 S. W. (Ky.) 785; 132 Ill. 385; 39 Minn. 204; 26 Wis. 104.

4. There was no failure of consideration. The deed recites a consideration of past indebtedness.

*Samuel M. Casey,* for appellee.

1. The evidence shows fraud or deceit in obtaining the deed, and there was no delivery of the deed, nor intention on the part of the grantor to lose control of it. 109 Am. St. Rep. 310; 40 Am. Rep. 212; 50 Am. St. Rep. 188.

2. There was undue influence. 1 Story, Eq. Jur. § 307; *Ib.* 308; 3 Hare, Lead. Cas. in Eq. 140, 141; 17 Ill. 148; 26 Ark. 605; 38 Ark. 428; 40 Ark. 28; 84 Ark. 490.

WOOD, J., (after stating the facts). It is not necessary to determine whether or not the court erred in finding that appellant had induced appellee to sign the deed through misrepresentation and deceit, or by undue influence over her, for we are of the opinion that the evidence does not show that the deed was delivered to appellant, and therefore the judgment of the court cancelling the deed must be affirmed.

The testimony of appellant and appellee shows clearly that it was not the intention of either that the deed should be delivered to appellant so as to give him the control over the deed and to at once pass the title to him. According to the testimony of appellant his mother was to place the deed where he could get it if anything happened to her. This evidently means that the deed was to be placed where appellant could get it when his mother died. The place designated was "the little black tin box of hers." He could get it there. But, according to his own testimony, it was "where he could get it if anything happened to her." According to the testimony of appellee, she expected Mr. Cole to hand the deed to appellant, and that he would bring

it to her; "she thought she could have destroyed it" if she changed her mind. Her testimony shows that she expected, after the deed was made, to have absolute dominion over it. When therefore appellee made the deed and left it with Cole to be delivered, as he says, to appellant, it was for the purpose of allowing appellant to look over it to see whether it would suit him or not (as she had made some changes in it), and then he (appellant) was to bring it home to her. The recording of the deed by appellant was wholly unauthorized. It was not the intention of the grantor to give him any control over the deed to make it operate as a conveyance of title to him.

This is the only conclusion warranted by the evidence. This is the only conclusion that will give effect to the testimony of all the witnesses and make the testimony of all consistent.

There is no delivery unless what is said and done by the grantor and grantee manifests their intention that the deed shall at once become operative to pass the title to the land conveyed, and that the grantor shall lose dominion over the deed. *Creighton* v. *Roe,* 109 Am. St. Rep. 310; *Byars* v. *Spencer,* 40 Am. Rep. 212; 13 Cyc. 748, f. note 56; 9 Am. & Eng. Ency. Law, p. 154; *Russell* v. *May,* 77 Ark. 90; *Cribbs* v. *Walker,* 74 Ark. 104. In the last case *supra,* it was held that the facts showed an intention on the part of the grantor to deliver the deed. No such intention is shown here.

The decree is therefore affirmed.